The Honorable John C. Coughenour

1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   UNITED STATES OF AMERICA,                    NO. CR21-099 JCC

11                        Plaintiff,

12          v.                                     GOVERNMENT'S SENTENCING
                                                   MEMORANDUM
13   ELVIN HUNTER BGORN WILLIAMS,

14                        Defendant.

15

16                          **I.      Introduction.**

17          For years, members of the community flagged Elvin Williams to the FBI as

18   someone who was at high-risk of committing a violent terrorist act in the name of ISIS.

19   The community members who contacted the FBI had no axe to grind with Williams.

20   They were the very people acting as his support system – high school administrators,

     leaders of the mosque Williams attended, and his own mother. They all repeatedly saw
21
     the warning signs and felt compelled to report their concerns to the FBI.
22
            This started in 2017 when Williams was 17 years old. Administrators at his high
23
     school reported his disturbing behavior to the FBI, followed close in time by his mother.
24
     The FBI acted responsibly and with restraint. Agents met with Williams' mother, who
25
     requested that they speak with him directly. They did, and Williams essentially told them
26
     what they wanted to hear – that although he had been expressing support for ISIS and
27

Government's Sentenicng Memorandum – 1                    UNITED STATES ATTORNEY
*United States v. Williams*, CR21-099 JCC                 700 STEWART STREET, SUITE 5220
                                                          SEATTLE, WASHINGTON 98101
                                                          (206) 553-7970

saying that he wanted to travel to Syria to fight for ISIS, he "no longer felt that way." The FBI did not pursue a formal investigation at that time.

But over the next couple of years, Williams' mother and the leaders of the mosque continued to express their concerns that Williams' radicalization was escalating, and that he was preparing to join ISIS abroad, conduct a violent attack closer to home, or both.

In November 2020, the FBI opened an investigation. Agents reviewed Williams' online activities and interviewed his family members and associates. It quickly became clear that Williams was a danger to be taken seriously. He had already pledged an oath of *bayat* (allegiance) to the leader of ISIS. He had been telling others that he wanted to travel overseas, join ISIS, and wage violent jihad on behalf of ISIS. And he repeatedly stated that if he was unable to travel abroad, he planned to commit a local attack in the name of ISIS.

In February 2021, after assessing the significant degree of Williams' radicalization, the FBI's investigation shifted into a more proactive mode, using Confidential Human Sources (CHS's). Williams began communicating over an encrypted messaging app with two CHSs portraying themselves to be ISIS recruiters who would approve and facilitate his travel to fight with ISIS. Through these purported ISIS recruiters, Williams tendered a putative application to ISIS listing his reason for travel as "jihad." The "recruiters" ultimately told Williams that his application had been approved, and Williams requested to travel to the Sinai desert to fight with ISIS. The "recruiters" told Williams that his travel would receive final authorization after he obtained a passport and purchased an airline ticket.

During the spring of 2021, Williams applied for a passport and got a job to earn money for his anticipated travel. He used all his earnings to buy military supplies and a plane ticket, even though he was practically destitute. Williams also recruited another Seattle area associate to travel with him; unbeknownst to Williams, this associate recently had become another CHS. The day Williams received his passport, he contacted the ISIS recruiters and purchased a plane ticket from Seattle to Cairo, Egypt, departing on May 28, 2021. Williams was arrested attempting to board that flight.

Government's Sentenicng Memorandum – 2
*United States v. Williams*, CR21-099 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Williams pled guilty to Providing Material Support to ISIS, but he now wants this Court to believe that the FBI entrapped him using the CHS's and that he did not engage in the offense conduct volitionally or with any clear thinking. Williams claims that his mental health issues caused him to be susceptible to manipulation by the CHS's; "none of this would have happened" but for the CHS's; and his mental state made it impossible for him to form the specific intent required under the Terrorism Enhancement. The Court should reject these claims. The facts show that Williams already had set down the path of supporting ISIS through violence long before the CHS's became involved in the investigation. And even thereafter, his conduct consistently was volitional, calculated, willful, and directed.

For the reasons set forth herein, the government recommends a sentence of imprisonment of **180 months** and a term of supervised release of 15 years, with all the conditions of supervised release recommended by the Probation Office.

## II.     Williams' Offense Conduct.

### A. Williams' Activities Prior to the Introduction of the CHS's.

The FBI's investigation of Williams began in November 2020 but remained relatively passive until February 2021, when the CHS's became involved. A review of Williams' activities prior to that time makes clear that he had already chosen the path of supporting ISIS through violence and had been reaching out to others for assistance in connecting with ISIS leaders abroad.

### 1.   Community Members Repeatedly Contact the FBI About Williams.

Williams first came to the attention of the FBI in October 2017, when he caused concern among administrators at his high school. Williams told others at school that he wanted to join ISIS and claimed that the 2017 ISIS attack at a music concert in Manchester, during which numerous people were killed and injured, was justified because the performer dressed provocatively. C. 4.[1]

---

[1] The Complaint (Dkt. 1) is attached as Exhibit 1 and will be cited as C. __," referring to the page numbers. Most of the same facts are also contained in the Presentence Report.

Government's Sentenicng Memorandum – 3
*United States v. Williams*, CR21-099 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

FBI Special Agents met with Williams' mother in November 2017. She reported that Williams told her he wanted to move abroad to fight for ISIS. She also stated that Williams had been kicked off social media for terms of service violations related to pro-ISIS posts. As a result, she terminated internet service at her home to prevent him from accessing ISIS propaganda. C. 4.

Later that day, at his mother's request, agents spoke with Williams. He admitted that he had been interested in fighting for ISIS and had reached out over social media asking others for assistance in contacting ISIS but got no response. He also visited a mosque in Tukwila to meet with someone whom he thought could connect him with ISIS. However, Williams told the agents that he had changed his mind and no longer felt like joining ISIS, and realized it was wrong. He disavowed his support of ISIS. The FBI did not open an investigation into Williams at that time.

A few weeks later, in January 2018, Williams' mother contacted the FBI again to express concern over Williams' state of mind. She told the FBI that Williams' mentor at the mosque caught him watching terrorist videos. Williams also tore-up his classroom at school and told school administrators that as soon as he turned 18, he would travel to Iraq to "be with his people." Williams' mother said she did not think, at that time, he was an imminent threat to harm himself or others.

In November 2020, a concerned citizen approached the FBI on behalf of the Seattle area mosque that Williams attended. The mosque had been supporting Williams during the past year – encouraging Williams to de-radicalize, assisting him with a place to live, with food, and with tuition for a semester of college. Members of the mosque also provided Williams with a cell phone and a laptop computer to use for a job search. The mosque members made clear to Williams that he was required to abandon ISIS if he accepted their help. C. 4.

When the concerned citizen observed Williams using the phone to view ISIS videos and engage in online chats with other radical individuals, he took the phone away. Members of the mosque reviewed the phone and were disturbed to find numerous ISIS-related videos that depicted scenes of graphic violence (including summary executions

Government's Sentenicng Memorandum – 4
*United States v. Williams*, CR21-099 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and beheadings by ISIS militants); other ISIS military propaganda; and a video on how to manufacture explosives, which Williams appeared to have distributed to others. The concerned citizen told the FBI that, in response to these developments, the mosque terminated its efforts to support Williams. C. 4-5.

### 2. The FBI Opens its Investigation.

The FBI opened an investigation in November 2020 to assess the extent of Williams' radicalization. The initial phase of the investigation involved several interviews and a review of Williams' online activities. This confirmed that Williams was an increasingly radical and volatile individual who appeared to be determined to support ISIS through acts of violence.

#### i. The FBI Interviews Williams and Those who Know Him Well.

FBI agents interviewed Williams' mother on several occasions during late 2020 and early 2021. She said that Williams now referred to ISIS as "our people" and that he was becoming more radical each day; he had recently begun talking about plans to move abroad to "become a terrorist for real"; and he said that "everyone is waiting" and soon there would be a terrorist attack. Williams claimed to be waiting for approval to carry out an attack and described a chain of command within ISIS that approves such attacks. The mother also stated that Williams was obsessed with weapons and talked about explosives and chemicals. She further said that members of the mosque contacted her because they were worried that Williams would be "a terrorist and do an attack one day." C. 5.

FBI agents also interviewed a roommate who lived with Williams during October 2020. The roommate described Williams as "radical" and referred to him as a "terrorist." According to the roommate, Williams told him that he wanted to join ISIS and openly discussed his affinity for ISIS. The roommate regularly saw Williams participating in ISIS-related online chatrooms. C. 6.

FBI agents interviewed Williams on several occasions during late 2020. Williams admitted that he regularly made pro-ISIS postings on social media platforms. He said he no longer attended a mosque because he was "too extreme" for the mosques. Williams also said he felt isolated, lonely, and wanted to "find a wife." Williams stated that he had

Government's Sentencing Memorandum – 5
*United States v. Williams*, CR21-099 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

been "off of [his] medications" for about a year and admitted to having suicidal thoughts, but claimed to have no present intention of hurting himself or others. C. 6.

### ii. Williams' Online Communications About ISIS.

A review of Williams' online communications confirmed that he was deeply obsessed with ISIS and vowed to support the terrorist group through acts of violence.

By November 2020, Williams had posted an online video of himself pledging a formal oath of allegiance (*bayat*) to the leader of ISIS. C. 7.

Shortly thereafter, Williams participated in several online group chats[2] during which he discussed his adherence to ISIS ideology and his desire to commit acts of violence in the name of ISIS. *See, e.g.* C. 12 ("I was going to go and do my *jihad* in Iraq and Sham [Syria] but the caliphate lost territory there . . ."; "[I] want my photos online just in case I become a *shaheed* [martyr]"; "It happened when I posted all the instruction vids and bomb making video"; "The only reason why I stay kinda quiet and don't say or discuss things I want is so I don't get raided before I can be martyred"; "Can somebody send me the ruling on suicide bombing. . . But by ones [sic] own hand, such as a truck bombing or vest"; "Since I have no defense I suppose I will use my offense. Nobody will help me supply myself with a shield so I will supply them with the end of my sword.").

Williams later engaged in an online chat during which, among other things, he made the following statements about his ideas for conducting an attack: "We need to attack a public event one with some degenerate celebrity like the one in 2017 with that whore Ariana Grande. … My options are motor vehicle and the ancient one: fire. … Fire spreads fast and can kill many if set in an apartment or place of business but can be thwarted and put out." C. 12-13. Importantly, none of these chats involved undercover or CHS participants – these were Williams' statements made to others who shared his radical ideologies.[3]

---

2  Williams participated in chats that were closed to the public and open only to members who were vetted by a moderator. Once in the group, participants talked openly about their commitment to ISIS. C. 12, n. 8.

3 The FBI acquired these communications through various means, including legal process and screenshots provided by informants who gained access to the forums but did not participate in the conversations themselves.

Government's Sentenicng Memorandum – 6
*United States v. Williams*, CR21-099 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### 3.  Williams Discusses ISIS and Travel Plans with his Mother.

In early January 2021, Williams' mother recorded a conversation with Williams out of concern that he was radicalized and poised to commit a violent crime. She shared the recording with the FBI. *See* Complaint at pages 9-11 (transcript of relevant portions of conversation). Williams specifically identified himself as a member of "ISIS"; spoke of ISIS using the pronoun "we"; and talked about his plan to travel abroad to fight with ISIS militants. Williams said he planned to "get[] a job" to raise money to fund his travel. Williams also implicitly acknowledged being a "terrorist":

| | |
|---|---|
| **Mother:** | I didn't raise you to be racist. |
| **Williams:** | I'm not racist. |
| **Mother:** | And I didn't raise you to be a terrorist, either. |
| **Williams:** | I'm not racist. |

### 4.  The Concerned Citizen from the Mosque Contacts the FBI Again.

Around the same time, the concerned citizen from the mosque contacted the FBI regarding a recent conversation he had with Williams. Williams said it was his *dawah* (duty) to commit a violent act to get his message across and that he was waiting for his call to *hijrah*. Williams further said that he had been making multiple attempts to contact overseas ISIS members, thus far without success. The concerned citizen said that Williams did not seem to have immediate plans for violence but was ready when the call came. He described Williams as increasingly radicalizing. C. 13.

### B.  The FBI Investigation Begins to More Proactively Target Williams.

The investigation became more proactive after the FBI assessed the significant degree of Williams' radicalization. Beginning in February 2021, the FBI tasked CHS-4 and CHS-5 to have online communications with Williams over an encrypted messaging app. These CHS's had pre-existing online identities posing as recruiters for ISIS.

Williams first encountered CHS-4 in an online chat group. Williams discussed a recent coup in Burma perpetrated by ISIS militants and stated: "There is going to be a call for *hijrah* there very very soon.  Maybe this year or the next. … *I am trying to get into contact [with ISIS].  But no luck so far.*" CHS-4 offered: "I know a brother who

apparently has contact," referring to CHS-5. Williams replied: "Send me his contact. I need to leave this place." C. 14.

CHS-4 then initiated a group chat between Williams, CHS-4, and CHS-5, who portrayed himself as an ISIS recruiter who would facilitate Williams' travel for jihad. *See* Complaint 14-20 (extensive documentation of ensuing conversation). Williams expressed his desire to join ISIS and fight with ISIS troops abroad. CHS-5 explained that Williams would need to make an application to join ISIS which would be vetted by ISIS leadership. At the end of the process, Williams' travel would be approved to a specific location. During this and subsequent conversations, CHS-5 told Williams that before final approval would be granted and a specific travel destination designated, Williams would first need to obtain a passport for travel. CHS-5 sent Williams the purported ISIS application to fill out. Williams completed the application and sent it back immediately, stating that his reason for travel was "Jihad" and describing himself as being "strong, proficient in close quarters with handgun."

Shortly thereafter, on February 14, 2021, CHS-2 became involved in the investigation. CHS-2 was an associate of Williams at his former mosque. Williams soon told CHS-2 about his plan to travel and fight for ISIS. Over the next few weeks, he attempted to convince CHS-2 to travel with him. C. 21, 22. CHS-2 ultimately "agreed" to travel with Williams, which Williams reported back to the ISIS recruiters. C. 21-22.

**C. Williams Undertakes Several Independent Acts Confirming his Intentions.**

From that point forward, the investigation became a sting operation that provided Williams with the opportunity to commit his crime. Contrary to Williams' present claim of "imperfect entrapment," the CHS's did not hold Williams' hand and walk him though every step of the way. Rather, the investigation was set up to require Williams to initiate the steps necessary to commit the crime to ensure he was acting of his own volition.

**1. Williams Got a Job and Used the Pay Checks to Fund his Trip.**

Williams had been unemployed for months. But after submitting the ISIS application, he quickly found a job and began working regular shifts. He told the CHS's

that he was working for the specific purpose of raising the funds needed for his trip to join ISIS. C. 25. He pawned his laptop computer for the same reason. C. 25.

Williams – who was virtually destitute – then spent all his earnings on the trip. After CHS-5 gave him a list of items to bring to Egypt, Williams bought several of the items, including camouflage gear and military fatigues. Williams sent CHS-2 a photo of himself wearing the gear and said he used his first paycheck to purchase the items. C. 27. Later, Williams surprised the CHS's by purchasing his plane ticket earlier than expected. Williams selected the date of travel and specific flight itinerary on his own and sent it to the CHS's after the purchase. C. 31.

### 2. Williams made a Martyrdom Video.

In late April 2021, Williams told CHS-2 that he had prepared a video and sent it to an ISIS sympathizer in Kazakhstan to publish over the internet after Williams became a martyr. C. 28. CHS-2 asked Williams for a copy of the video, which Williams provided. During the video, Williams exhorts others to commit violent attacks where they live. Speaking on behalf of ISIS using the pronoun "we," he demanded:

> We want to see your action. … Where are you, oh *mujahideen*? … If you are true and sincere in what you say, we would hear about such attacks happening. We would see the blood on your knives, on the bumpers of your cars, and on the barrels of your guns. So why do we not?

C. 28 (containing full text of Williams' statements).[4]

### 3. Williams Badgered the ISIS Recruiters About Speeding Up the Timeline and Chose his Travel Destination.

Williams did not sit back and wait to be told what to do by the CHS's. Rather, he was pushy about the timing and logistics of his travel and vocal about where he wanted to go. He repeatedly asked the ISIS recruiters to speed things up and for more information. *See, e.g.* C. 21 ("I need to hurry up and leave already. … I need the approval and fast.");

---

4 Williams told the Probation Office that he made the video against his will "at the repeated prompting of CHS-2" and that this should be reflected in their text messages. See PSR ¶ 59, n. 5. This is a bogus claim with no support in the record. There are no such text messages. PSR ¶ 59, n. 5. CHS-2 first learned of the video when Williams gave him a copy. Williams made the martyrdom video on his own.

C. 24 ("I want to travel somewhere with desert, like Sinai. … I wish for Sinai.");
C. 24 ("I need to know where I am supposed to go in Egypt, who will meet us, when he
will meet us, things like that."); C. 26 ("Where do we go, I need to know so I know how
much for the flight ticket. … I don't want to spend any unnecessary time here.");
C. 30 ("I have all the supplies ready, I have the passport, and I will be able to buy a ticket
by next Friday. I am just waiting on which country we need to buy a ticket for, and
instructions on where to go."); C. 30 ("Sinai, but I need instructions on which city to
travel too [sic], and who I will contact to bring me to the *wilayat* [Islamic State].").

### 4.  Williams Worried About Being Arrested by the FBI.

Williams repeatedly expressed concern that he was being monitored and may be
arrested by the FBI. *See, e.g.* C. 9 (telling his mother the "FBI is probably freaking
parked outside" their house); C. 12 (expressing concern in chat forum about getting
"raided before I can be martyred"); C. 21 (worrying about being placed on the "no-fly"
list"); C. 21 ("I got reported to the FBI again."); C. 25 (text to CHS-2 stating, "FBI IS
AFTER ME APPEARENTLY [sic]" with link to an article about an American couple
arrested at the airport attempting to join ISIS); C. 31 ("I am very excited, just think I may
get detained at the airport."); C. 33 (telling CHS-2 he was worried about being arrested
and that law enforcement "in the U.S. can do anything they want. … This is why they
make you *hijrah*, fake *hijrah*, and then they put you in the prison, where you stay.")

These comments reveal that Williams was thinking (and worrying) rationally
about the consequences of his actions rather than just blindly taking direction from the
CHS's. He made the decision to ignore these concerns and continue down the path of
attempting to support ISIS through the commission of violent acts.

### 5.  Williams Undertook the Final Actions to Complete the Crime.

Up until the very end, Williams had the opportunity not to go through with his
attempted travel. But he took all the final steps necessary to complete the crime. For
example, he forcefully rebuffed the opportunity provided by CHS-5 to back out of the
crime. C. 34 ("Back out? Never, why would I back out of attaining *junnah* [eternal
paradise]? There is nothing greater than fighting and dying in the cause of Allah.").

Government's Sentencing Memorandum – 10
*United States v. Williams*, CR21-099 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Williams also went to bid farewell to his mother in the days before his intended travel. C. 34. And, finally, he attempted to board the airplane to Egypt. C. 35.

### D.  Williams Expressed Eagerness to Commit Heinous Acts of Violence.

Williams' offense conduct is notable – and extremely disturbing – for how eager he seemed to be to commit grotesque acts of violence in support of ISIS. He repeatedly discussed his desire and willingness to kill, behead, and maim those who oppose ISIS.

- During their initial conversation, Williams told CHS-5 that he wanted to bring "beheading and death to our enemies." When asked, "What do you think of beheading? With knife or something u know?" Williams replied: "I would love to do this." Williams also said that blood "does not bother me in the slightest bit. As I said, I am firm with death and have no fear." C. 18.

- Williams later told CHS-5: "I wanted to remind I wish to die in the battlefield. I feel slightly uncomfortable with detonating myself as there is a slight disagreement, but if I am told to blow myself up for my brothers and for the sake of Allah I will. … I wish to see the *kuffar* as I kill them, I want to strike terror in them and make Allah pleased for doing so." C. 30.

- Williams told CHS-4: "My stomach is turning … stupid ass Israelis just angers me. … Well, look forward to killing them and their allies. I hope [] they allow me to do a beheading. I can't wait." C. 32.

- Williams told CHS-2, "Man, I really want to behead the, [hope] they make me executioner." CHS-2 asked, "You want to beheading people? Are you full okay with that? Are you okay with blood?" Williams replied, "Yeah, 100%, man. ... But, yeah, I really want to. Like, I don't want to do *ishtihadi* [suicide attack]. I don't want to, you know. . . I would prefer to kill them." CHS-2 asked, "Is it like beheading?" Williams responded, "Either way, it doesn't bother me." C. 33.

### E.  Williams Planned to Support ISIS by Conducting an Attack in the United States if he was Unable to Travel and Fight Abroad.

Williams pledged his allegiance to ISIS and intended to provide support to the terrorist group by carrying out acts of violence. His preference was to travel overseas and fight on the battlefield with ISIS warriors – what he referred to as "*hijrah*." But if that was not possible, Williams planned to commit an attack in the homeland – what he called "*jihad*." Williams harbored great resentment and hatred towards the United States,

describing it as "this disgusting land," "this disgusting place," "this disgusting land of *fitnah* and temptations," and "*dar al kuffar* [land of the non-believers]." *See, e.g.* C. 13, 21, 23, 30. He consistently talked about conducting an attack in the United States if he was unable to travel abroad.

- "We need to attack a public event one with some degenerate celebrity like the one in 2017 with that whore Ariana Grande. … My options are motor vehicle and the ancient one: fire." C. 12-13.

- "Maybe they will put me on no-fly list. … If they do they will regret it and I will make my j** [*jihad*] here. … I am not going to discuss this on the phone but if I am prevented from leaving the land of the *kuffar* it will be so." C. 21.

- During a conversation with CHS-2, Williams stated: "This is what I'm saying man, [if] they prevent me from leaving America, they're gonna fucking regret it." Williams said he preferred to conduct an attack overseas because he could kill more people. He thought a local attack would only kill around 20 people but was willing to do it if he was not allowed to travel. C. 22.

- Williams again told CHS-2 that if the government prevents him from traveling overseas, he would be willing to conduct an attack in the United States. C. 24.

- After expressing concern that the "FBI is after me," Williams stated: "Okay, I just don't want to find out at the airport and be taken away. If I find out before, I can get approval for an *istshhadi* [suicide] operation here. . ." C. 25-26.

- Williams told CHS-2 that he had attempted to convince a friend who had access to firearms to commit an attack (with Williams) at the upcoming Seattle Pride Parade. Williams described the parade as: "Where the faggots do their march." Williams planned "an *ishtihadi* [suicide] operation." He proposed driving a semi-truck through the parade without "hav[ing] to stop once" and then to "get out and shoot." Williams showed his friend "the map and everything." Williams was irate that his friend did not agree to participate. C. 29 (containing transcript of relevant portions of the conversation).

Later, during his post-arrest interview, Williams confirmed over and over again that he had intended to conduct a homeland attack in the name of ISIS if he was not able to travel abroad.[5]

---

5 These quotations are taken from the FBI-prepared transcript of the recorded interview.

Government's Sentenicng Memorandum – 12
*United States v. Williams*, CR21-099 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

When asked whether he had been seeking "permission from ISIS . . . to do an attack," Williams responded: "Typically, that's how it works. ... Which is actually good that you detained me and are not, you know, going to release me right away because, you know, I get stuck here, everybody's going to pay for it. I'm not going to be stuck here."

Williams said it was his duty to "go and make *hijrah*. It's obligatory. And if I can't then I am supposed to strike the *kufar*" in place.

"And so you ask me you know how can I mentally prepare myself to kill these people? I would enjoy killing these people. These people are hurting my family. They're persecuting us. … Their government that they're supporting, that the people that they elected, you know, the people that are sending their sons off to go and fight us for money. That's majority of the reason why people join the U.S. Army."

"Our goal isn't necessarily to just kill you guys. And to just terrorize you guys, it's to live our life. … [I]t's my obligation to leave. If I can't leave then I need to make sure you guys, you know, the United States gets the message."

When asked, "[S]o if you weren't allowed to leave, then at some point, you would've acted upon something?" Williams responded: "Yeah. I-I promise you." Williams then discussed his knowledge of how to manufacture an explosive compound he referred to as "white ice" and said, "I am actually absolutely positive that's what's been used in the majority of attacks."

"I was actually doing, planning on doing an attack [in 2016]. I wasn't planning on making *hijra* back in 2016. … I was supposed to do something, and this gangster guy was supposed to give me a handgun. And I was going to make explosives and go out shooting. But . . . he didn't give me the gun. ... I'm actually very glad that didn't happen because . . . that would be completely unsanctioned. I would probably do [it] wrong, and just cause problems. … And I doubt I would even probably be a martyr 'cause I was just a complete idiot. I just wanted to kill people."

"It's either *hijrah* or *jihad*. This is what we have to do. Either you leave or you, you know, uh… Either you pack your bags [] or you prepare explosive devices. This is the only options."

Williams said his message to the U.S. government was: "Die in your rage. It is our phrase. It means go to hell."

Government's Sentenicng Memorandum – 13
*United States v. Williams*, CR21-099 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Williams' secondary plan of committing a homeland attack in the name of ISIS was consistent with ISIS directives and propaganda, which exhorted ISIS followers to commit attacks where they live if they were unable to travel and fight in the caliphate. Williams possessed numerous such ISIS propaganda videos on his smartphone. For example, the video entitled "Inside the Khilafah" was stored on Williams' smartphone and contained the following message to ISIS supporters like Williams:

> If you're unable to make *hijrah* to the caliphate to support your religion and to fight on the front lines, then terrorize the disbelievers with your jihad outside of the caliphate, by targeting them and shedding their blood. Select your target and carry out a strike that will tear out their hearts and make them lose their minds, for a piercing bullet or a stab deep in the intestines or the detonation of an explosive device in your lands is akin to a thousand operations here with us. And target them on the streets. Prepare yourself for war and ignite the fires.

*See also* "Hell of the Mushrikin" (ISIS video stored on Williams' phone encouraging homeland attacks, depicting a burning map of the United States, and specifically calling for attacks using guns, fire, and explosives); "To Our Brothers and Sisters in Iman" (ISIS video stored on Williams' phone calling for attacks in America and allied nations, with scrolling text reading: "Kill them all. It is now time to rise. Slit their throats. Watch them die. Go and answer the call. Men who answered the call. Terrorizing the World.").

## III.  Legal Issues.

### A.  The § 3A1.4 "Terrorism Enhancement" Applies in this Case.

The Probation Office is correct to apply the § 3A1.4 "Terrorism Enhancement" in the Presentence Report. They are also correct in noting that "this enhancement's impact on the defendant's criminal history category and offense level is extreme." Addendum to PSR at 7. As a result, the Probation Office has recommended a downward variance. The government takes the same approach (although to a differing degree in terms of the variance). A fair analysis of the facts should compel the Court do the same – apply the § 3A1.4 enhancement and then vary downwards from the Guidelines as warranted.

The enhancement applies when the offense "involved, or was intended to promote, a federal crime of terrorism." *United States v. Alhaggagi*, 978 F.3d 693,699 (9th Cir.

Government's Sentenicng Memorandum – 14
*United States v. Williams*, CR21-099 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

2020). The term "federal crime of terrorism" is defined as "an offense that is …
calculated to influence or affect the conduct of government by intimidation or coercion,
or to retaliate against government conduct." *Id.*[6] The government must prove the
enhancement by clear and convincing evidence. *Id.* at 700.

Where, as here, a defendant's offense involves planned violent acts of terrorism,
the enhancement typically applies. "In cases involving violent acts of terrorism, specific
intent is relatively easy to identify, either from the statements or admissions of the
defendant or the nature of the offense." *Alhaggagi*, 978 F.3d at 701-02 (contrasting cases
involving violent acts with those involving non-violent support, such as setting up social
media accounts, and holding that, in non-violent cases, "evidence beyond the facts
underlying the offense conduct must reflect [] the enhancement's requisite intent."); *Id.* at
702, n. 8 (favorably citing *United States v. Mohamed*, 757 F.3d 757, 760 (8th Cir. 2014)
(enhancement applied to conviction for conspiracy to provide material support by
assisting men who were traveling to Somalia to fight against Ethiopian troops)).

Williams' offense involved his planned commission of violent acts in support of
ISIS. Whether those acts were to take place during *hijrah* overseas or as part of a *jihad*
homeland attack, violence was the consistent component of Williams' offense. Moreover,
Williams' statements regarding his hatred and resentment for the United States and other
nations that opposed ISIS make clear that his offense was undertaken with the intent to
retaliate against and influence or affect the conduct of governments. Indeed, Williams
had been telling others for months that he planned to commit a violent act *to get his
message across* and he confirmed the same during his post-arrest interview ("If I can't
leave then I need to make sure you guys, [] the United States gets the message."). *See*
PSR Addendum at 5-7 (citing additional evidence in support of the enhancement).

The facts of this case call for the application of the § 3A1.4 enhancement.

//

---

6 The offense of conviction must also be a violation of certain enumerated statues, such as the Material Support statute under which Williams was convicted. *Id.*

Government's Sentenicng Memorandum – 15
*United States v. Williams*, CR21-099 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**B.  There is no Basis to Lower the Sentence for "Imperfect Entrapment."**

Williams asks the Court to impose a lower sentence based on his claim of "Imperfect Entrapment." Dkt. 31. There is no basis to do so here.

Although the Ninth Circuit has recognized the imperfect entrapment defense in some sentencing contexts, it has "foreclosed imperfect entrapment as a basis for a departure *where the defendant had pled guilty*." *United States v. McClelland*, 72 F.3d 717, 725 (9th Cir. 1995) (citing *United States v. Garza-Juarez*, 992 F.2d 896, 912 n.1 (9th Cir. 1991) (original emphasis)). Because Williams pled guilty in this case, he is foreclosed from raising the claim of imperfect entrapment at sentencing. *United States v. Briggs*, 623 F.3d 724, 730 (9th Cir. 2010) ("In this case [] we conclude that Briggs' guilty plea forecloses him from raising this claim.") (citing *United States v. Dickey*, 924 F.2d 836, 839 (9th Cir. 1991) ("[A]t least where a defendant pleads guilty to an offense, we see no warrant for the argument that governmental … misconduct should mitigate the sentence of an admittedly guilty defendant.")). *See United States v. Ritter*, 539 Fed. Appx. 811, 812 (9th Cir. 2013) ("Ritter's 'imperfect entrapment' defense is foreclosed because he pleaded guilty.") (citing *McClelland*, 72 F.3d at 725).

Even if an imperfect entrapment claim were available to Williams, the facts of this case do not support it. Although none of us can know for sure what Williams would have done had members of the community not identified him as a terrorist threat – leading to the FBI's investigation – a commonsense review of the record belies Williams' claim that "none of this would have happened" (PSR ¶ 125) but for the government actors.

Williams was well on his way to committing the crime prior to any involvement by CHS-2, CHS-4, or CHS-5. Community members had repeatedly identified Williams as a danger in 2017, 2018, 2020, and early 2021, when the concerned citizen from the mosque reported that Williams recently had said it was his duty to commit a violent act to get his message across and that he had been making *multiple attempts to contact overseas ISIS members* without success. Williams had previously told his mother and his online chat associates the same thing – that he already had been reaching out to ISIS for

Government's Sentencing Memorandum – 16
*United States v. Williams*, CR21-099 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

deployment guidance and instructions.[7] Williams' online activities corroborated his radicalization and intention to support ISIS through violence. He posted a video pledging *bayat* to ISIS, participated in privately moderated ISIS chatrooms, and repeatedly discussed his desire travel and/or commit a homeland attack in the name of ISIS. *All of this preceded the involvement of CHS-2, CHS-4, and CHS-5.*

It was only after all of this that the government provided Williams with the opportunity to complete the crime he had already begun pursuing. Although he started to coordinate his activities through the CHS's, Williams needed little prompting or handholding to complete the offense. He immediately filled-out the "ISIS application"; repeatedly badgered CHS-4 and CHS-5 about the logistics and timing of his travel; got a job and pawned his laptop to raise travel funds; used all the money to buy military gear and a plane ticket; created a martyrdom video; obtained a passport; said farewell to his mother; and attempted to board the flight to Egypt. The government may have provided Williams with the opportunity he was looking for, but he did the rest himself.

The FBI acted responsibly in conducting this investigation. They needed to watch Williams closely because he claimed to not only be preparing to travel overseas to fight with ISIS, but also to be planning a local terrorist attack. The use of the CHS's enabled the FBI to closely monitor Williams' activities. This also allowed the FBI to divert Williams down a safe avenue toward completing the crime if he chose to do so. The informants did not overstep their bounds. They gave Williams room to demonstrate his true intent by initiating the steps necessary to complete the crime.

The Court should reject Williams' present attempts to portray himself as nothing but a hand puppet of the CHS's. There is no basis to reduce the sentence for "imperfect entrapment."[8]

---

7 Similarly, during Williams' first contact with CHS-4, he stated, "*I am trying to get into contact [with ISIS]. But no luck so far.*" C. 14.

8 Williams' argument about the reliability of the CHS's is a distraction. The only contacts Williams had with CHS-4 and CHS-5 were online. All their communications were preserved. The reliability of these informants is simply not germane to Williams' offense. Regarding CHS-2, the government disclosed from the outset that he had pending state charges and was working with the FBI in hopes of consideration as to those charges. C. 21, n. 15. Based on

Government's Sentencing Memorandum – 17
*United States v. Williams*, CR21-099 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

# IV.     Sentencing Recommendation.

2

The government recommends a sentence of imprisonment of **180 months** and a

3

term of supervised release of 15 years. The § 3553(a) factors support this sentence.

4

## A. The Nature and Circumstances of the Offense and Need for the Sentence to Reflect the Seriousness of the Offense and to Provide Just Punishment.

5

6

Williams' offense conduct was extremely serious. For years he had been obsessed

7

with ISIS' violent ideology. He was becoming increasing radicalized and volatile. By late

8

2020 into early 2021, Williams consistently was discussing his desire to travel overseas

to fight on the battlefields with ISIS or to conduct a terrorist attack in the United States if

9

he was unable to travel. He was eager to kill the *kufar* by means of beheadings,

10

shootings, and explosive attacks; and was even willing to conduct a suicide operation if

11

directed. He derived great pleasure envisioning himself committing these violent acts and

12

was proud to be martyred in the name of ISIS. Williams' actions throughout this

13

investigation – both before and after the involvement of the CHS's – showed that he was

14

serious about what he said.

15

Fortunately, Williams connected with CHS-4 and CHS-5, and not the real thing.

16

Actual ISIS recruiters are online and connect with U.S. persons to facilitate their travel in

17

a similar manner as CHS-4 and CHS-5 did for Williams. There is every reason to believe

18

that Williams would have undertaken the same travel had he succeeded in connecting

19

with the real ISIS recruiters he had been seeking out on his own for months.

20

We will never know for sure whether Williams would have conducted a

21

homeland attack in the name of ISIS had his efforts to travel continued to be stymied. But

22

there is good reason to be concerned. Time after time, we have watched in horror as

23

_____

24

CHS-2's cooperation, the state prosecutors later reduced the charges and the FBI paid him for his services (although he did not expect to receive payment). The government has produced extensive discovery materials documenting

25

CHS-2's motives for cooperation and the benefits he received. Regardless, there is nothing that raises serious questions about CHS-2's reliability during this investigation. CHS-2's contacts with Williams were documented and

26

preserved in the form of text messages and audio recordings. Although CHS-2 at times assisted Williams with some logistics (*i.e.*, driving Williams to the passport application appointment and providing him with money to pay for the

27

passport at Williams's request), C. 23, 24, Williams generally acted independently and of his own volition and even went so far as to "recruit" CHS-2 to join ISIS.

Government's Sentenicng Memorandum – 18
*United States v. Williams*, CR21-099 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

individuals commit mass shootings and other terrorist attacks. These attacks typically are committed by self-radicalized individuals (through online propaganda) who become obsessed with violence, harbor resentment toward society in general, feel like they have nothing to live for, and who suffer from mental health issues. Williams presents in the exact same way. He repeatedly told others that he planned to commit a homeland attack if he could not travel abroad. He confirmed that was his plan during the post-arrest interview. There is little reason to doubt this.

**B. Williams' History and Characteristics.**

Williams' personal history and characteristics contain both mitigating and aggravating aspects. The government acknowledges that Williams had a very challenging upbringing. He was not set up for success, to say the least, and that is not his fault. Despite that, Williams found himself with a strong network of support. His mother – despite her own issues – tried to move Williams off the ISIS path he had embarked on. His high school administrators saw the warning signs; they contacted the FBI and provided him with IEP support and in-school counseling. And the members of his mosque did everything they could to help Williams, providing him with religious guidance, food, shelter, and electronic devices to use for a job search. Williams rejected their efforts to de-radicalize him and instead used the devices to collect ISIS videos and communicate with others about ISIS. So, although Williams certainly faced challenges, in the end he had a support system to help him overcome. That is more than some people end up with. Williams chose to reject this help and continue his pursuit of supporting ISIS through planned acts of violence.

The defense focuses heavily on Williams' mental health issues. The government acknowledges that these are legitimate and serious conditions. And it is appropriate for the Court to mitigate Williams' sentence to a degree considering these issues. But Williams overstates the extent to which these conditions mitigate his culpability.

For example, Williams argues that he lacked the mental capacity to form the specific intent required under the § 3A1.4 enhancement. However, the record shows that Williams "does not lack capacity; he is an intelligent individual who understood and

Government's Sentencing Memorandum – 19
*United States v. Williams*, CR21-099 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

supported the values endorsed by ISIS. Being easily convinced of damaging, dangerous, and violent beliefs is not the same as lacking capacity to form specific intent." PSR Addendum at 7. Indeed, Williams was well-versed and articulate in discussing ISIS' radical ideology and he engaged in the offense conduct intending to promote the same. Williams' capacity to fully appreciate the nature and consequences of his actions also is reflected by how often he worried about the possibility of being arrested by the FBI, placed on the no-fly list, etc.

Williams further argues that his mental health issues make him less of a danger moving forward because he is incapable of engaging in planned, organized, or strategic violence. This misses the point. No one is suggesting that Williams would be likely to mastermind a sophisticated attack. Nor does ISIS encourage its followers to do so. They promote simple, impulsive attacks using readily available means such as firearms, vehicles, or basic explosives. Williams is more than capable of conducting such an attack – exactly the sort of attack he discussed undertaking – notwithstanding (and perhaps fueled by) his mental health issues.

In the end, Williams's mental health is a double-edged sword. It provides some mitigation, but also makes him volatile, reactive, and susceptible to the influences of others who espouse dangerous and violent ideologies. A lengthy sentence is necessary to protect the public from Williams.

## C.  The Need to Afford Adequate Deterrence to Criminal Conduct.

This case presents the Court with an opportunity to send an important message of general deterrence. Sadly, this case is far from unique. ISIS and other terrorist groups engage in the recruitment of would-be supporters using online propaganda communication tools. Far too many U.S. persons fall prey to this recruitment and attempt to travel to fight with terrorist groups overseas or seek to commit local attacks in the name of terrorist organizations. The sentence in this case will be well-publicized and therefore may have a powerful deterrent effect on those who would seek to support foreign terrorist organizations through acts of violence.

Government's Sentenicng Memorandum – 20
*United States v. Williams*, CR21-099 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**V.     Conclusion.**

For the foregoing reasons, the government recommends the Court sentence Williams to a term of imprisonment of 180 months and a term of supervised release of 15 years, with all the conditions of supervised release recommended by the Probation Office.

DATED this 22nd day of November, 2022.

Respectfully submitted,

NICHOLAS W. BROWN
United States Attorney

*s/ Todd Greenberg*
TODD GREENBERG
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-3903
Facsimile: 206-553-4440
Phone: 206-553-2636
E-mail: Todd.Greenberg4@usdoj.gov

Government's Sentenicng Memorandum – 21
*United States v. Williams*, CR21-099 JCC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970