THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ELVIN HUNTER BGORN WILLIAMS,<br><br>Defendant. | No. CR21-099-JCC<br><br>ELVIN HUNTER WILLIAMS'S SENTENCING MEMORANDUM |

## I.   INTRODUCTION

For his profoundly misguided effort to provide material support to a terrorist organization, Elvin Hunter Bgorn Williams ("Hunter") respectfully asks this Court to impose a sentence of 36 months' imprisonment followed by 15 years of supervised release. At the time of his offense, Hunter was just 20 years old, suffering from serious and disabling psychological disorders that made him vulnerable to influence, and had no criminal history. Multiple government confidential human sources (CHSs), motivated and far more sophisticated than Hunter, encouraged Hunter's extreme and ideological interpretation of Islamic principles and facilitated his attempt to travel. Since his arrest, Hunter has shown extraordinary remorse for his actions and distanced himself from the ideology he once espoused. Given these factors and others discussed below, a sentence of 36 months' imprisonment and 15 years of supervised release is sufficient to achieve the goals of sentencing.

ELVIN HUNTER WILLIAMS'S
SENTENCING MEMORANDUM
(*United States v. Williams*, CR21-099-JCC) - 1

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

Probation and the Government calculate the Guidelines as recommending a 20-year sentence, a number that distorts the sentencing analysis. Because Hunter lacked the specific intent necessary to warrant application of U.S.S.G. § 3A1.4, an enhancement that increases the guideline range from 46–57 months to 240 months, the defense objects to its application. Probation, and to a lesser extent the Government, appropriately recognizes many factors merit a significant variance. Probation and the Government nonetheless suggest that many more years in prison are necessary to achieve the goals of incapacitation, deterrence, and retribution. Given Hunter's age, vulnerabilities, and mental health needs, as discussed below, these goals can be achieved with a significantly shorter custodial sentence.

Earlier this month, Hunter turned 22 years old, the second birthday he has spent at the Federal Detention Center. The defense recommendation allows Hunter to mature, reintegrate into the community, and find stability while still in his early 20s, and to have the support and oversight of federal supervision throughout his 30s. Hunter's difficulties are profound, but the public school system was able to guide Hunter through school, and the United States Probation Office can manage Hunter as well, if not better, as a young adult. A prison is no place for a person like Hunter to spend his entire early adulthood.

## II.     BACKGROUND

Hunter's life and offense conduct are carefully and thoroughly set forth in the Presentence Report and in Dr. Mark Cunningham's psychological evaluation, filed separately under seal as Exhibit 1. The defense will not repeat that entire background. Given the task before the Court and the centrality of Hunter's history and characteristics, especially as they relate to his vulnerabilities, and the nature and circumstances of the offense, the defense reiterates some of that background here.

ELVIN HUNTER WILLIAMS'S
SENTENCING MEMORANDUM
(*United States v. Williams*, CR21-099-JCC) - 2

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

### A. Hunter's "development was characterized by extensive adverse developmental factors, encompassing transgenerational, neurodevelopmental, parenting and family, community, and disturbed trajectory arenas." Ex. 1 at 1.

Hunter was born to a family that has suffered for generations from mental illness, substance use disorder, and trauma. *See, e.g.,* PSR ¶¶ 97, 101; Ex. 1 at 16–18. His maternal grandmother suffered from alcoholism and died in an alcohol-related accident; his maternal grandfather was a heavy drinker, used marijuana and cocaine, and then developed an addiction to crack. Ex. 1 at 16–17. Hunter's mother suffers from depression and anxiety, and she has been diagnosed with bipolar disorder; she too has struggled with addiction. *Id*. Hunter's paternal grandfather was a heavy drinker who was in and out of jail. *Id.* at 16. His paternal grandmother abused methamphetamine and cocaine, neglected Hunter's father, and was in a series of abusive relationships. *Id.* Hunter's father left home by the time he was 13 years old, has been diagnosed with various mental illnesses, and is currently serving a life sentence as a persistent offender. *Id.;* PSR ¶¶ 97–98. He was largely absent throughout Hunter's childhood. PSR ¶ 98.

Given this multigenerational background, it is not surprising that Hunter has faced challenges since conception; his young, unwed mother experienced extraordinary stress, exposed him to cigarettes and marijuana in utero, and was involved in a serious car accident when she was five months' pregnant. Ex. 1 at 14. Hunter's birth itself was traumatic. He was born premature, his mother suffered a placental abruption in labor, and he reportedly did not breathe for the first five minutes after his birth. PSR ¶ 98.

His parents separated by the time he was a year and half old due to his father's criminal conduct and domestic violence. PSR ¶ 100. Instability and trauma ensued. Most of Hunter's young life was spent sleeping on the floor or on the couch as his family moved from crowded home to crowded home. PSR ¶ 103. Professionals at his schools realized that he lacked basic support and structure. Ex. 2 at 2; Ex. 3 at 5. His school social worker helped provide for his basic needs, as his mother did not meet

ELVIN HUNTER WILLIAMS'S
SENTENCING MEMORANDUM
(*United States v. Williams*, CR21-099-JCC) - 3

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

those needs. Ex. 2. In middle school, his mother's boyfriend's son sexually assaulted Hunter and his younger sister. PSR ¶ 110.

The combination of biology, prenatal exposure, trauma, and instability combined to cause a lifetime of challenges for Hunter. His behavior has been concerning since he was two years old, and he began mental health treatment that same year. PSR ¶¶ 99, 133. He was prescribed psychotropic medication when he was just five or six years old. PSR ¶ 133. He has been diagnosed with bipolar II disorder, Tourette's disorder, obsessive-compulsive disorder, generalized anxiety disorder, mood disorder, and pervasive developmental disorder. *Id.*; *see also* Ex. 1 at 7–8. Throughout his school years, he was so emotionally and behaviorally disabled that he was in self-contained special education classrooms. PSR ¶ 149; *see also* Ex. 1 at 2.

"At age 18, Hunter discontinued maintenance medication and mental health follow-up against medical advice and lost SSI support, as he refused to acknowledge his psychiatric disability. Of course, Hunter's chronic psychological disorders did not remit with his denial of them. In the absence of family structure, mental health services, and medication maintenance, he foundered." Ex. 1 at 14.

**B.     Hunter's social isolation, social dysfluency and resulting vulnerability to "persons offering interaction, affirmation, status, and logistical direction and support."**

Hunter is socially dysfluent. He had no close friends in childhood and as a teenager was only friends with one family group; even they saw him as an "outcast." Hunter struggled making meaningful connections. Dr. Cunningham explains, "Hunter's social dysfluency resulted in his being socially isolated and ostracized, and markedly limited his ability to establish authentic reciprocal friendships and/or romantic relationships." Ex. 1 at 14.

This isolation left him vulnerable to people who cared about—or pretended to care about—him. As Dr. Cunningham notes, "Hunter had never had a sense of

ELVIN HUNTER WILLIAMS'S
SENTENCING MEMORANDUM
(*United States v. Williams*, CR21-099-JCC) - 4

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

significance or belonging, and had no knowledge of how to constructively establish this. This neediness and his serious psychological disorders rendered him extraordinarily vulnerable to being operationalized from idea to action by those who offered companionship, relationship, significance, purpose, structure, and belonging." Ex. 1 at 29. People who have known Hunter for years recognize the same. For example, his school social worker offered that Hunter has spent his life trying to find a way to individuate himself, to feel his self-worth, and to engage with a community. Ex. 2 at 4. His special education teacher explains, "He had lots of difficulties with his peers and struggled with finding ways to fit in. His way of trying to fit in was to mimic students or groups with whom he sought to belong, and in that way further alienated himself from them." Ex. 3 at 1.

Hunter found some sense of belonging in Islam and the mosque. Even this was limited by his social dysfluency. "Hunter found himself further misunderstood and isolated at the mosque and in the community, and was no closer in finding a place for himself in his local community." Ex. 1 at 36. His teacher explained that Hunter wore a ceremonial robe that had been given to him by members of the mosque to school. Hunter sought acceptance from the other Muslim students, but instead of accepting him, they ridiculed him. Ex. 3 at 3. Hunter ultimately found acceptance in more extreme online fora. Ex. 3 at 5. "Muslim group chats . . . opened an avenue of social interaction that he had never had before. Now there were people to talk to, with whom he could be whoever he wanted, with no risk of face-to-face rejection." Ex. 1 at 27.

His connection to extreme communities was not ideologically driven. He inconsistently espoused beliefs for different Islamic groups, including the Shia denomination, which has been persecuted by ISIS, and off-shoot Islamic groups in

ELVIN HUNTER WILLIAMS'S
SENTENCING MEMORANDUM
(*United States v. Williams*, CR21-099-JCC) - 5

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

Syria that are not formally designated as foreign terrorist groups.[1] Hunter's behavior exhibits a lack of understanding of the ideologies of both ISIS and Islam.

Incarcerated at the Federal Detention Center, Hunter's quest for connection and belonging continues and is evidenced by the fact that he is exploring Shintoism with Asian-Pacific Islander inmates who have befriended him in prison. Ex. 1 at 5.

### C. The Government exploited Hunter's vulnerabilities.

#### 1. The Government knew of Hunter's serious mental illnesses.

When law enforcement first became aware of Hunter, they contacted his mother. PSR ¶ 14. The FBI told his mother that they were trying to "help" him and, believing this promise, she provided the FBI with Hunter's medical and mental health records. PSR ¶ 115. By this time, Hunter had already been diagnosed with ADHD, mood disorder, disruptive behavior disorder, pervasive development disorder, bipolar II disorder, Tourette's disorder, and generalized anxiety disorder. PSR ¶ 133. The Government was reminded of Hunter's mental health struggles in late 2020. During an interview with the FBI, Hunter told agents that he felt "isolated, lonely, and repeatedly expressed his desire to 'find a wife.'" PSR ¶ 18. He further stated that he had been "off of [his] medications" for about a year. *Id.* Hunter admitted to previously having suicidal thoughts but stated that he had no current intentions of hurting himself or others. *Id.*

#### 2. The Government's willingness to charge Hunter with a material support offense centered on his willingness to travel in support of a foreign terrorist organization.

The Government has long known that Hunter posted and chatted about extreme Islamic videos on the internet, but did not believe there was a basis to charge him:

---

[1] Hassan Hassan, The Sectarianism of the Islamic State: Ideological Roots and Political Context - Carnegie Endowment for International Peace, Carnegie Endowment for International Peace (June 13, 2016).

ELVIN HUNTER WILLIAMS'S
SENTENCING MEMORANDUM
(*United States v. Williams*, CR21-099-JCC) - 6

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

> On 12/31/2020, SA D. Narrance contacted AUSA T. Greenberg via telephone regarding a case update and possible federal charges against Elvin Hunter Bgorn WILLIAMS. Recently discovered activity and behavior was shared with AUSA T. Greenberg. AUSA T. Greenberg does not see enough information for a chargeable offense.

The Government was willing to prosecute Hunter, however, if he attempted to travel.[2]

> Currently, WILLIAMS is attempting to obtain a US Passport. Once WILLIAMS has a passport, he plans to travel overseas in order to fight for ISIS. WILLIAMS needs a passport in order to book international travel for the purpose of providing material support to ISIS. AUSA T. Greenberg is willing to charge WILLIAMS with 18 USC 2339A if he attempts to travel in support of ISIS.

    **3.    The Government facilitated the central aspect of this offense—Hunter's attempt to travel overseas.**

The Government used "multiple confidential human sources to encourage Hunter toward further extreme ideology," PSR ¶ 176, to get him to take steps to travel. The CHSs[3] provided "financial, emotional, and logistical influence." PSR ¶ 177. While Hunter was interested in ISIS before the Government's involvement, he did not have the means or basic life skills to attempt to fly abroad and act upon the extreme ideologies. PSR ¶ 121. And he had never attempted to commit a violent act in the name of Islam domestically.

Through the use of multiple CHSs, the Government influenced Hunter every step of the way leading up to his eventual arrest. During one of his earlier conversations with CHS-4, Hunter stated that he was trying to get in contact with ISIS but has had "no luck so far." PSR ¶ 33. In response, CHS-4 offered: "I know a brother who apparently

---

[2] Hunter had even asked the FBI for legal advice about what he could say online.
[3] The reliability, credibility, and motives of the CHSs have never been independently assessed despite Hunter's request that the CHS files be provided to the Probation Office or this Court. PSR ¶ 32 n.3. The Court should reject attempts to bolster their credibility in a memorandum. Dkt. 34 at 4; *see also* Ex. 5, filed separately under seal.

ELVIN HUNTER WILLIAMS'S
SENTENCING MEMORANDUM
(*United States v. Williams*, CR21-099-JCC) - 7

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

has a contact," referring to CHS-5. Hunter took CHS-4 up on his offer, and CHS-4 initiated a group chat with Hunter, CHS-4, and CHS-5. PSR ¶ 33.

Once connected with CHS-5, Hunter asked him for guidance on how to "make hijrah and help with the next caliphate." PSR ¶ 34. He sought instructions on what to do, when to leave, and where to go. *Id.* CHS-5 detailed the steps Hunter would need to take, including making an application to join ISIS and waiting for the application to be vetted by multiple layers of ISIS leadership. PSR ¶¶ 34–42. CHS-5 asked Hunter about logistics—if he had the means to travel, including money for a flight, ticket, and passport. PSR ¶ 37. Hunter responded that he was poor, but CHS-5's inquiry prompted Hunter to begin the process of obtaining the money he needed to pay for his travel. *Id.* CHS-5 repeatedly detailed the application process, emphasizing that Hunter must first obtain a passport before final approval would be granted and a specific travel destination designated. PSR ¶ 41. CHS-5 sent Hunter the purported ISIS application. PSR ¶ 42. Throughout, CHS-5 maintained close contact with Hunter, providing logistical support and instructions every step of the way. PSR ¶¶ 9–13.

The Government's influence continued through its use of CHS-2. CHS-2 was critical to Hunter's efforts to obtain money for a passport and an airline ticket. PSR ¶¶ 10–11. When Hunter became nervous and expressed hesitation about going to the airport, CHS-2 dismissed Hunter's concerns: "Believe me nobody after you, you just overthinking and don't believe the rumors." PSR ¶ 58.

In addition to providing financial and logistical support, the CHSs posed leading questions to Hunter, eliciting (seemingly by design) inflammatory statements and pushing Hunter further into extremist ideology. For example, during one conversation, CHS-5 prompted Hunter: "U know brother the media that show beheading and death to our enemies. This u want?" PSR ¶ 39. As the conversation continued, CHS-5 pressed Hunter: "U have problem with killing or something?" *Id*. In another conversation with

ELVIN HUNTER WILLIAMS'S
SENTENCING MEMORANDUM
(*United States v. Williams*, CR21-099-JCC) - 8

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

CHS-4, CHS-4 commented to Hunter: "My stomach is turning . . . stupid ass Israelis just angers me." PSR ¶ 65. After Hunter's "application" was supposedly approved, a purported ISIS recruiter asked Hunter: "This is the time some brothers choose to back out. I want to make sure you know that ifu decide not to make hijrah it is no problem. Need to make sure u are fully committed now." PSR ¶ 69.

### 4. CHS-2 was uniquely motivated by the serious child sex offense he faced to curry favor with the Government.

CHS-2 is a lawful permanent resident who came to the United States after he was kidnapped and threatened by a terrorist group in Iraq.[4] Ex. 5 at 23. He is 11 years older than Hunter and well educated, with two engineering degrees. Ex. 5 at 3, 22.

In September 2019, CHS-2 was charged with attempted commercial sexual abuse of a minor when he was prepared to pay $150 to a 15-year-old fictitious girl in exchange for sex. Ex. 5 at 1. When arrested, the prosecutor noted that CHS-2's conduct "demonstrates that he is an experienced sex buyer and sexually attracted to juvenile girls." Ex. 5 at 2. He worked with juveniles prior to his arrest and continued to do so while his case was pending. Ex. 5 at 14–15. When confronted by law enforcement, CHS-2 made a false statement, demonstrating his propensity to minimize, lie, and skew facts with law enforcement officers when he faces jeopardy. Ex. 5 at 4. As charged, CHS-2 faced deportation—back to Iraq, where he had been threatened with execution—because the child sex offense constituted an aggravated felony.[5] Even beyond deportation to Iraq, CHS-2 faced serious consequences: a standard range of 15.75 to 20.25 months that would have been served in the Washington State

---

[4] Ex. 5 at 12. The defense discovered this information independently. The FBI never bothered to provide this information to the USAO. The Court should treat with great skepticism statements Hunter made to CHS-2 or CHS-2's statements.

[5] RCW 9A.28.020; 8 U.S.C. § 1101(a)(43)(A); Practice Advisory, *Aggravated Felonies*, IMMIGRANT LEGAL RESOURCE CENTER (April 2017) (available at aggravated_felonies_4_17_final.pdf (ilrc.org)).

ELVIN HUNTER WILLIAMS'S
SENTENCING MEMORANDUM
(*United States v. Williams*, CR21-099-JCC) - 9

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

Department of Corrections; community custody for three years; a ten-year term of sex offender registration; and a mandatory $5,000 fine.

After cooperating against Hunter, CHS-2 was allowed to plead guilty to two misdemeanors, Communicating with a Minor for Immoral Purposes (CMIP) and Patronizing a Prostitute. Ex. 5 at 22. CHS-2 received three significant benefits from this plea agreement. First, he avoided pleading guilty to a felony and avoided the litany of collateral consequences that follow, including the immigration consequences associated with an aggravated felony. Second, he served only seven days in jail, far less time than he faced if convicted of a felony offense. Third, he received a deferred sentence for the CMIP charge. After the deferred sentence is completed, he is allowed to seek an order withdrawing the plea and dismissing the charges entered by the sentencing court. As an added benefit, he is removed from the sex offender registry list and can continue working with underage children. And, if and when the CMIP charge is dismissed, he will have no criminal convictions and all immigration risk disappears. It is not beyond reason to expect that the Government will advocate on CHS-2's behalf when he tries to become a citizen or obtain status beyond that of an LPR.

CHS-2 was highly motivated to deliver Hunter to the Government. As stated by the FBI agent himself: "we couldn't have brought [Hunter's case] to prosecution without him." Ex. 5 at 61. He was "very instrumental" in convincing Hunter to attempt to travel overseas.

//
//

## III. THE SENTENCING GUIDELINES ARE MISCALCULATED AND DO NOT COME CLOSE TO APPROXIMATING AN APPROPRIATE SENTENCE.

### A. The Government cannot prove the specific intent necessary for the application of § 3A1.4.

The defense objects to the application of U.S.S.G. § 3A1.4(a) because the Government cannot prove by clear and convincing evidence that Hunter specifically intended to promote a federal crime of terrorism. "To trigger this enhancement, the government must prove elements distinct from those of the crime of conviction, specifically that the offense committed 'involved, or was intended to promote, a federal crime of terrorism.'"[6] *United States v. Alhaggagi*, 978 F.3d 693, 699 (9th Cir. 2020). The Government must prove Hunter had the requisite *specific* intent, "beyond the intent required to establish a violation of the material support statute." *Id.* The Government must also prove Hunter's intent by clear and convincing evidence, a standard of proof that "reflects the value society places on individual liberty," *Mondaca-Vega v. Lynch*, 808 F.3d 413, 422 (9th Cir. 2015) (en banc) (internal cites omitted), and requires "an abiding conviction that the truth of [the] factual contentions" are "highly probable." *United States v. Lonich*, 23 F.4th 881, 916 (9th Cir. 2022).

The specific intent requirement reflects the Sentencing Commission's intent that the enhancement should only apply where a defendant is a "dangerous terrorist[]" who needs to be punished more severely than others. *Alhaggagi*, 978 F.3d at 699. In cases that do not involve violent acts of terrorism, such as in material support cases, the conviction alone is not enough evidence to prove that the enhancement should apply. *Id.* at 701; *see also United States v. Arcila Ramirez*, 16 F.4th 844, 854–55 (11th Cir. 2021) (holding district court erred in applying terrorism enhancement because it failed

---

[6] A "federal crime of terrorism" is defined as an offense that is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332B(g)(5)(A).

ELVIN HUNTER WILLIAMS'S
SENTENCING MEMORANDUM
(*United States v. Williams*, CR21-099-JCC) - 11

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

to make any evidentiary findings regarding defendant's intent when she aided Columbian Cartel).

The outsized influence of the CHSs, combined with Hunter's severe and disabling psychological disorders, prevented him from forming the requisite specific intent for the § 3A1.4 enhancement to apply to his sentencing. Although he generally intended to provide material support for ISIS, his conduct was not specifically intended or calculated to influence or retaliate against the United States government, as § 3A1.4 requires.

The Government will likely argue that Hunter's online statements expressing his admiration of ISIS, his desire to become a martyr, and the knowledge that ISIS was a terrorist organization are evidence enough to establish that he had the requisite specific intent for the enhancement to apply. The Court should reject these arguments. First, as highlighted above, the Government itself represented to the FBI that those chats alone did not support charging Hunter criminally. Second, Hunter's severe and disabling psychological disorders, his disengagement from treatment, his preteen maturity level, and the influence of more sophisticated, motivated CHSs make his online musings insufficient to establish the application of the enhancement.

B. **Even if the Court applies the enhancement, the resulting criminal history category (VI) grossly overestimates the necessary punishment.**

Even if the Court applies the enhancement, the Court should discount the Guidelines because Hunter in no way approximates a person typically found in criminal history category VI. *See United States v. Alhaggagi*, 372 F. Supp. 3d 1005, 1012 (N.D. Cal. 2019), vacated and remanded, 978 F.3d 693 (9th Cir. 2020) ("[T]he enhancement's treatment of criminal history—automatically assigning to all terrorism defendants a criminal history category of VI—is inappropriate based on the seriousness of the crime,

ELVIN HUNTER WILLIAMS'S
SENTENCING MEMORANDUM
(*United States v. Williams*, CR21-099-JCC) - 12

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

inappropriate based on assumptions about recidivism, and inappropriate as to this Defendant, warranting a downward departure.").

Hunter was just 20 years old at the time of his offense. He has no criminal history and has not shown that harsher-than-normal punishment is necessary because of his risk of recidivism. To the contrary, he has shown that he is remorseful, amenable to treatment, and someone who welcomes the help of more established figures—whether a teacher, a social worker, or even an FBI agent. He will welcome the guidance of his probation officer.

### C. U.S.S.G. § 3A1.4 is not based on empirical evidence and does not promote the goals of Congress or the Sentencing Commission.

The Court also should depart from the guideline range because § 3A1.4 was adopted without the support of empirical evidence and was created arbitrarily to deal with a relatively novel issue at the time. Neither the Sentencing Commission nor courts that have applied the terrorism enhancement have provided any evidence to support the presumption that terrorism defendants are uniquely dangerous. Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 1520 (2017). In affirming sentences based on the notion that terrorism defendants are unique in terms of recidivism, rehabilitation, and need for incapacitation, appellate courts have not cited to any evidence. *Id.* There have been no studies to determine how much time a convicted "terrorist" should serve. George D. Brown, *Punishing Terrorists: Congress, the Sentencing Commission, the Guidelines, and the Courts*, 23 Cornell J.L. & Pub. Pol'y 517, 520 (2014).

While providing far too much weight to the "terrorism" label, the Guidelines totally fail to account for the role of the CHSs and Hunter's uniquely challenging circumstances.

ELVIN HUNTER WILLIAMS'S
SENTENCING MEMORANDUM
(*United States v. Williams*, CR21-099-JCC) - 13

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

## IV. A THREE-YEAR TERM OF IMPRISONMENT FOLLOWED BY 15 YEARS OF SUPERVISED RELEASE IS SUFFICIENT TO ACHIEVE THE GOALS OF SENTENCING.

### A. The defense-recommended sentence is sufficient to fulfill the goal of retribution given the harm threatened and Hunter's culpability.

"The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." *Tison v. Arizona*, 481 U.S. 137, 149 (1987). *See also Miller v. Alabama*, 567 U.S. 460, 472 (2012) (recognizing case for retribution not as strong for juveniles as for adults). "[T]he degree of blameworthiness of an offense is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime...." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (2005).

### 1. Despite concerning rhetoric, the actual harm threatened can be sufficiently punished by three years of prison and 15 years of supervised release.

While the harm theoretically threatened by Hunter was alarming, there was no world in which Hunter would be able to join ISIS, travel overseas, and engage in violence. As detailed in Dr. Cunningham's report, Hunter's skills were more consistent with a preteen than an adult. Ex. 1 at 34. He did not bathe or brush his teeth regularly. *Id.* Into his late teens, he required prompts and close supervision in order to stay on task in household chores, and he performed chores inadequately. *Id.* He could not be given more than one household assignment at a time, nor be left unsupervised in the kitchen. *Id.* He could not write a check, and his survival depended on the charity and assistance of others. *Id.* He could not hold onto a job for long, as his limitations in even rudimentary tasks quickly became apparent. *Id.* Dr. Cunningham offers, "As he

ELVIN HUNTER WILLIAMS'S
SENTENCING MEMORANDUM
(*United States v. Williams*, CR21-099-JCC) - 14

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

struggles to maintain basic hygiene and keep his room clean, his independent organizing capability to engage in lone wolf terrorism is doubtful." Ex. 1 at 40.

Hunter would not have been able to coordinate his travel and act upon his ideologies without the Government's extensive involvement. He would not have known whom to contact and what steps to take in order to join ISIS or travel abroad; he would not have had the financial resources to pay for an airline ticket and passport; and he would not have gone as far as to act upon the extremist ideologies the CHSs encouraged.

While he made alarming statements prior to the involvement of the CHSs, the "threat" posed by Hunter only came to be through the CHSs' persistence and the federal resources devoted to getting Hunter to actually attempt to travel. The CHSs fanned the flames of Hunter's ideology, despite being well aware of his lifelong mental health struggles.[7] The CHSs taught Hunter what he needed to do, introduced him to the people he thought he needed to know, helped him find employment, helped him get a passport, and more. CHS-2 was particularly motivated, given the charges he was facing and the enormous consequences they would trigger.[8] The harm actually threatened does not justify incarcerating Hunter throughout his entire young adulthood.

---

[7] The Government's use of aggressive sting operations against mentally ill individuals is not limited to this case. A 2014 report by Human Rights Watch analyzed 494 cases identified by the Justice Department as relating to international terrorism. *See Illusion of Justice: Human Rights Abuses in US Terrorism Prosecutions*, COLUM. L. SCH. HUM. RTS. INST. & HUM. RTS. WATCH (July 21, 2014) (available at [Human Rights Watch (columbia.edu)](#)). The report documents a pattern targeting vulnerable individuals with intellectual and mental disabilities and poor people. *Id.* at 4, 27–41.

[8] The skepticism leveled with respect to CHSs finds support in the Department of Justice Inspector General Michael E. Horowitz's *Audit on the FBI's Management of Its Confidential Human Source Validation Processes*, Justice OIG (Nov. 19, 2019), found at https://oig.justice.gov/node/624. That report leveled broad criticisms against the government that the FBI failed to oversee CHSs, maintain files, and protect the community. Here, the United States Attorney's Office represented to the defense that CHS-2's court records, attached as Ex. 5 and which bear directly on his credibility,

ELVIN HUNTER WILLIAMS'S
SENTENCING MEMORANDUM
(*United States v. Williams*, CR21-099-JCC) - 15

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

### 2. Hunter's involvement was made from a steep angle,[9] skewed by many mitigating factors.

The Court must also assess Hunter's culpability. Dr. Cunningham explains that "the degree of 'blameworthiness' of an individual for criminal or even murderous conduct may vary depending on what factors and experiences shaped, influenced, or compromised that choice." Ex. 1 at 5. Here, the factors that influenced Hunter are manifold and mitigate the need to punish Hunter.

Most obviously, Hunter is young—in both years and maturity level. "Juveniles' susceptibility to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult." *Thompson v. Oklahoma,* 487 U.S. 815, 835 (1988). Hunter was just 20 years old at the time of his offense and much more like a preteen than an adult. The prefrontal cortex, which helps people "inhibit impulses and to plan and organize your behavior to reach your goals," is one part of the brain that continues to grow and develop into a person's 20s. Tony Cox, [Brain Maturity Extends Well Beyond Teen Years : NPR](#) (Oct. 10, 2011). Hunter's brain is still developing.

Hunter's actions are also mitigated by his severe and debilitating mental illness. Hunter's interest in ISIS was not part of his ideological core beliefs but an example of his "highly restrictive, fixated interests." Ex. 1 at 10. Intense obsessions with particular topics are a common experience for individuals like Hunter who have attention-deficit hyperactivity disorder (ADHD) and autism spectrum disorder (ASD).[10] While in these

---

were not included in his FBI CHS file. The Court should treat snippets and excerpts addressed to the CHSs with skepticism because the parties cannot be assured that the CHS files in this case contain all relevant information to make an accurate assessment of reliability. The defense has repeatedly invited the Government to provide this Court with the complete CHS records, *ex parte*, trusting that the Court will review their files keeping in mind Hunter's interests. The Government has rejected that invitation.

[9] *See* Ex. 1 at 6.

[10] *See Signs and Symptoms of Autism Spectrum Disorder*, CENTER FOR DISEASE CONTROL AND PREVENTION: AUTISM SPECTRUM DISORDER (Mar. 28, 2022), https://www.cdc.gov/ncbddd/autism/signs.html; *see also* Amanda Barrell, *What to know*

ELVIN HUNTER WILLIAMS'S
SENTENCING MEMORANDUM
(*United States v. Williams*, CR21-099-JCC) - 16

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

hyper-focused episodes, it is common for an individual to be "fully engrossed" in their interest.[11] In individuals diagnosed with ADHD, specifically, it has also been observed that they can also lose interest without explanation.[12] Throughout Hunter's life, he has found and then fixated on different interests and hobbies. Ex. 1 at 10–11. Adults in Hunter's life describe a series of different identity shifts, including changing his name multiple times during school, identifying as transgender, and fixating on having female companionship and sex—all of which involved Hunter becoming very interested and then suddenly moving on. *Id.*; Ex. 3 at 1–2.

Hunter's involvement in this offense was more a reflection of his psychological diagnoses than ideological belief. He does not have deep-seated anti-American beliefs that are fundamental to his being. His interest in ISIS could have also been an episode of interest in something more innocuous, as were the subject matters he became interested in during his developmental years. This is not to say Hunter's beliefs and conduct should not cause concern to those in his community and to those he loves. It is to say that this behavior is tied to how his brain processes the world around him and not to beliefs that are irreversible and inherent to his being.

The Court should also consider Hunter's social dysfluency, his desperate desire to find a community, and the role of the CHSs in creating that "community." The Court should also give weight to the fact that this offense occurred when Hunter was struggling even more than usual. "As demands for adult adaptive skills accelerated in his late teens, Hunter's supports for navigating adult demands fell away: he was no longer receiving mental health consultations, he discontinued medication support, he

---

*about ADHD and hyperfocus*, MEDICAL NEWS TODAY (Jul. 8, 2019), https://www.medicalnewstoday.com/articles/325681.
[11] Barrell, *supra*.
[12] *Id.*

ELVIN HUNTER WILLIAMS'S
SENTENCING MEMORANDUM
(*United States v. Williams*, CR21-099-JCC) - 17

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

was put out of the house—without economic resources and with pre-teen adaptive skills. It is not surprising that [he] spiraled down." Ex. 1 at 28.

"As the damage and impairing factors . . . increase, choice is exercised on an increasing slope, and moral culpability is correspondingly reduced." Ex. 1 at 5. For Hunter, his "choice" was made on a steep slope, tilted by serious and disabling psychological disorders, social isolation, poor problem-solving skills, low self-esteem, a sense of desperation and futility, and a not-yet-fully-developed brain. Ex. 1 at 7. A three-year prison sentence followed by 15 years of supervised release is sufficient to punish Hunter.

> **B. Providing meaningful support and supervision is a better way to achieve the related goals of incapacitation, specific deterrence, and rehabilitation than warehousing Hunter in prison for a period of years.**

The Government asks the Court to impose a sentence of 15 years' imprisonment, keeping Hunter in custody from 20 well into his 30s. The Government's warehouse-style recommendation seems to stem from the belief that Hunter's offense—encouraged by the Government's agents and rooted in mental illness—is ideological and that Hunter cannot be rehabilitated. By the Government's estimation, the only way to protect the public is to lock Hunter up for 15 years, presumably with the hope that prison will help him overcome the serious and disabling psychological orders that have plagued him since he was two years old.

First, Hunter's beliefs are not so strong that he is incapable of rehabilitation or redemption. Even when he was engaged in Islam and then extreme ideology, he had (and continues to have) inaccurate understandings of both ISIS and Islam as a religion. Hunter was not drawn to Islam or ISIS due to a calling or identifying with certain beliefs. Just three months after he came out as a transgender woman, he abandoned that

ELVIN HUNTER WILLIAMS'S
SENTENCING MEMORANDUM
(*United States v. Williams*, CR21-099-JCC) - 18

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

identity and declared he was Muslim. Ex. 3 at 2. More recently, upon being arrested, he quickly disavowed Islam altogether and is now practicing Shintoism.

Moreover, the Court should be under no illusion that prison will help Hunter. As former United States District Judge Nancy Gertner writes,

> It is hard to imagine an environment worse for a youthful offender than an adult prison. Professor Joshua Buckholtz, of the Harvard Department of Psychology, put it this way: If an evil genius scientist were hell-bent on using the most up-to-date neuroscientific insights to make youthful offenders more impulsive, aggressive, and antisocial, he could do no better than the adult prison: constant uncertain threat, being disconnected from communities, subject to long periods of social isolation, a regimented life that undermines their ability to learn to plan. He would break their ability to associate "good" behavior to future beneficial outcomes — a trait necessary for them to begin to envision a different life for themselves — by limiting access to meaningful occupational training and education while imprisoned, and/or ensuring that their occupational opportunities are impaired once released.

Gertner, Nancy, *19-Year-Olds Don't Belong in Adult Prisons*, Harvard Law School, available at http://www.nancygertner.com/news/19-year-olds-don%E2%80%99t-belong-adult-prisons (originally published in THE BOSTON GLOBE online edition, June 20, 2017).

While Hunter's move to Shintoism is a healthier outlet than the extreme ideology he had landed on, it "still reflect[s] his unstable sense of self, adolescent experimentation, and vulnerability to those offering acceptance/belonging." Ex. 1 at 37. Prison is not helping him to learn necessary life skills or address his severe and debilitating mental health disorders.

Probation has the resources available to support Hunter's development into an adult. The conditions of supervision proposed by Probation and accepted by the defense will help Hunter avoid the downward spiral he found himself in when he lost structure, lost support, and stopped taking his medication.

ELVIN HUNTER WILLIAMS'S
SENTENCING MEMORANDUM
(*United States v. Williams*, CR21-099-JCC) - 19

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

### C. A sentence of three years is also sufficient to achieve general deterrence.

The goal of general deterrence does not demand a sentence of seven or 15 years. To the extent that anyone pays attention to the sentence the Court imposes and then considers that sanction in deciding whether to commit a crime, the penalty does not need to be "particularly burdensome," but instead simply "one that people would seek to avoid." Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less is More When it Comes to Punishing Criminals,* 62 Buff. L. Rev. 1159, 1204 (2014).

## V. CONCLUSION

For all the reasons provided in this memorandum and after listening to the testimony of Dr. Cunningham, listening to Hunter speak, and listening to the defense's presentation, the defense respectfully asks the Court to impose a term of 36 months of imprisonment followed by 15 years of supervised release.

DATED this 22nd day of November 2022.

Respectfully submitted,[13]

s/ *Mohammad Hamoudi*
Assistant Federal Public Defender

s/ *Corey Endo*
First Assistant Federal Public Defender

Attorneys for Elvin Williams

---

[13] Undersigned counsel extend gratitude to University of Washington School of Law students Mustafa Alemi, Ayla Kadah, Arren Hernandez, and Ciera Phung-Marion for their research and contributions to this memorandum.

ELVIN HUNTER WILLIAMS'S
SENTENCING MEMORANDUM
(*United States v. Williams*, CR21-099-JCC) - 20

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100